United States District Court
Southern District of Texas
**ENTERED**
November 29, 2022
Nathan Ochsner, Clerk

# In the United States District Court for the Southern District of Texas

## GALVESTON DIVISION

No. 3:21-cv-98

KELLY STEVENSON-COTTON, *ET AL.*, *PLAINTIFFS*,

v.

GALVESTON COUNTY, *ET AL.*, *DEFENDANTS*.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

The defendants, Galveston County and Sheriff Henry Trochesset (the "County Defendants") and Dr. Garry Killyon, Boon-Chapman Benefit Administrators, Inc., Soluta, Inc., Soluta Health Inc., and Kathy White a/k/a Kathy Jean Jordan (the "Healthcare Defendants"), have filed two motions for summary judgment. Dkts. 45, 46. The court grants the defendants' motions as to the plaintiff's federal claims and, declining to exercise supplemental jurisdiction over the state-law claims, remands the case to state court.

## I.   BACKGROUND

This case arises from Ronald Cotton's death on March 14, 2019. Dkt. 6

at 2. The plaintiff is Cotton's estranged widow, Kelly Stevenson-Cotton. *Id.*

In January 2019, Cotton was brought to the Galveston County Jail after his arrest for assault, criminal mischief, unlicensed possession of a firearm, and burglary. Dkt. 46-1. While there, Kelly alleges Cotton experienced severe medical symptoms for which he received inadequate and delayed care. Dkt. 6 ¶¶ 18–46. Before his arrest, the plaintiff alleges that Cotton "was a healthy man without any known medical or mental health issues." *Id.* ¶ 15. At the time he arrived, however, Cotton likely suffered from undiagnosed and untreated diabetes. Dkt. 46 ¶ 12.

Cotton sought and received medical treatment twice during his first month at the Galveston County Jail. Dkt. 48 at 9. On January 13, 2019, Cotton complained to Registered Nurse Jennifer Lambright about abdominal pain. *Id.* Nurse Lambright diagnosed Cotton with "an unrevealing electrocardiograph" before discharging him back to his cell "in stable condition without need for medical intervention." *Id.* On January 25, Cotton again complained of abdominal pain, this time to Licensed Vocational Nurse ("LVN") Maricela Lopez. *Id.* Nurse Lopez found "normal bowel sounds and stable vital signs" and told Cotton to drink more fluids and to take milk of magnesia ("MOM") twice per day. *Id.*

The crux of Kelly's complaint stems from the medical treatment Cotton

sought in March 2019, in the days and hours leading to his death. The parties agree on the following facts concerning Cotton's treatment. *See* Dkt. 48 at 9– 12 (citing Dkt. 46 ¶ 13). On March 6, Cotton discussed constipation concerns with LVN Jessica Durham. *Id.* at 9–10. Nurse Durham noted normal bowel sounds and told Cotton to continue taking MOM, drink more fluids, and notify the clinic if he did not have a bowel movement over the next three to four days or if he experienced nausea, vomiting, pain, or fever. *Id.* at 10.

Cotton sought and received care twice on March 12. First, in the morning, Cotton reported "upper sternum chest pain" and "concerns over constipation" to LVN Sharon Gregory. *Id.* That morning, Cotton had stable vital signs and a mild heartbeat. *Id.* A few minutes after he arrived at the jail's medical clinic, Cotton's chest pain subsided, and he dismissed it as mere acid reflex. *Id.*; Dkt. 48-1 at 42 That evening, however, Cotton saw LVN Jessica Brooks and told her he had been constipated for ten days. Dkt. 48 at 10. A deputy also reported seeing Cotton vomit. *Id.* These events led Nurse Brooks to contact the physician on duty, Dr. Killyon, who prescribed two tablets of a fiber supplement and Colace[1] daily. *Id.* Dr. Killyon also asked Cotton to notify

---

[1] Colace is an over-the-counter stool softener that can help with constipation. *COLACE -Docusate Sodium Capsule, Liquid Filled*, Fed. Drug Admin., https://fda.report/DailyMed/a1591da0-a1a9-9583-3cf5-788b8fee3814 (last visited Nov. 17, 2022).

the clinic if he did not have a bowel movement in the next two days. *Id.*

The next day, March 13, Cotton's health declined quickly. Cotton's medical chart indicates that a deputy called Nurse Gregory at 12:04 p.m. to report seeing Cotton vomit "all morning." Dkt. 46-7 at 1–2. The reporting deputy immediately took Cotton to the prison clinic, where Cotton told Nurse Gregory he had not eaten in days. *Id.* Nurse Gregory's notes from that interaction point out that Cotton's claim conflicted with what he told clinic staff the day prior: that he had eaten "soups and chili the night before." *Id.* at 2. A separate entry on Cotton's chart notes him reporting mid-abdominal pain and continued constipation to LVN Melinda Amburn at 12:15 p.m. *Id.* at 1. Nurse Amburn recorded Cotton's elevated heartrate, tenderness around his belly button, and otherwise normal vital signs. Dkt. 48 at 10–11. Nurse Amburn also contacted Dr. Killyon to relay her findings, Cotton's recent visits, and Cotton's continued complaints of constipation. Dkt. 46–7 at 1. Dr. Killyon ordered an abdominal X-ray for the next day, March 14. Dkt. 48 at 11.

A few hours later, at 3:41 p.m., a deputy again called the clinic to report that he saw Cotton spit or vomit a "small amount, [or] a '[t]aste' size." Dkt. 46-7 at 1. Dr. Killyon "ordered the deputy to bring the contents of any further [vomit] to the clinic for further evaluation." Dkt. 48 at 11. Just over an hour

later, Nurse Gregory was called to Cotton's cell, where he was laying on the floor "puffing." Dkt. 46-7 at 1. Cotton asked to go to UTMB[2] and complained of "10 out of 10 pain 'all over his body.'" Dkt. 48 at 11; *see also* Dkt. 46-7 at 1. Cotton said that his lips were dry and that he had not eaten or drank "in days." Dkt. 46-7 at 1. Gregory reminded Cotton that he had reported eating "chili and soups" yesterday, which he denied. *Id.* Cotton also told Gregory he had been throwing up blood, but Gregory did not see any blood. *Id.* Nonetheless, Gregory quickly escorted Cotton to the clinic so Dr. Killyon could treat him. *Id.*; *see also* Dkt. 48 at 11–12.

Less than fifteen minutes after Nurse Gregory went to Cotton's cell, Dr. Killyon gave Cotton magnesium citrate, started him on oxygen, and performed a rectal exam, which "did not reveal any significant stool in the rectal vault." *Id.*; *see also* Dkt. 46-12 at 1. Dr. Killyon also tried "numerous times" to start an IV and had Cotton drink several glasses of water, though it appears from his medical records that Cotton eventually refused to drink fluids. Dkt. 46-7 at 1. At 5:45 p.m., Dr. Killyon ordered Cotton's non-

---

[2] UTMB, the University of Texas Medical Branch at Galveston, operates an acute-care hospital devoted to the care of Texas Department of Criminal Justice inmates. It is "the first and only hospital specializing in offender care on the campus of a major medical center and teaching institution." *UTMB TDCJ Hospital*, *utmb*Health, https://www.utmb.edu/cmc/tdcj-hospital/ (last visited Nov. 28, 2022).

emergent transit to UTMB. Dkt. 48 at 12; *see also* Dkt. 46-7 at 1. Fifteen minutes later, Cotton left for UTMB, where he arrived at 6:38 p.m. Dkts. 48 at 12; 48-2 at 1.

Upon Cotton's arrival at UTMB, he told nurses he was "very thirsty" and that he had suffered from "chest pain" for about "one week." Dkt. 48-2 at 10. He also denied a history of diabetes, initially refused care, and asked to leave, *Id.* at 9, because he was "just dehydrated." *Id.* at 4. The UTMB staff pleaded with him to stay at the hospital because they perceived him to be "very sick." *Id.* Eventually, Cotton agreed to lab tests. *Id.* At 9:20 p.m., UTMB transferred Cotton to intensive care. *Id.* At 11:57 p.m., Cotton suddenly started vomiting and was immediately moved to a trauma unit; he died less than an hour later. *Id.* at 12; Dkt. 45-2 at 13. The cause of death was "Diabetic Ketoacidosis." Dkt. 48-8 at 1. Upon his arrival at the Galveston County Jail in January and UTMB in March, Cotton disclaimed any history of diabetes. Dkt. 48-2 at 4.

Kelly, individually and on behalf of Cotton's heirs and as his estate's representative, initially brought this action in state court against Galveston County, Sheriff Henry Trochesset, Dr. Erin Barnhart, Dr. Killyon, Boon-Chapman Benefit Administrators, Inc., Soluta Health, Inc., Soluta, Inc., Teresa Becker, Kathy White, and Doe County Administrators, Physicians,

Nurses, and "P.A.s." *See* Dkt. 6 ¶¶ 3–10, 143. The defendants removed the case to this court on April 23, 2021. Dkt. 1. Kelly amended her complaint on May 10, 2021. Dkt. 6.

In the amended complaint, Kelly asserts the following federal claims: (1) general violations of the Fourth, Eighth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, *id.* ¶¶ 81–90, (all defendants); (2) violations of 42 U.S.C. § 1985, *id.* ¶¶ 138–142 (all defendants); (3) delay of medical care, *id.* ¶¶ 129–133 (all defendants); (4) conditions of confinement, *id.* ¶¶ 134–137 (Galveston County, Sheriff Trochesset, and Dr. Killyon); and (5) ratification of unconstitutional acts by a policymaker, *id.* ¶¶ 125–128 (Galveston County[3]). Kelly also alleges state-law claims[4]: (1) medical negligence in violation of the Texas Healthcare Liability Act, *id.* ¶¶ 91–95 (the Healthcare Defendants); (2) failure to assess, monitor, supervise, and train, *id.* ¶¶ 96–124 (Sherriff Trochesset, Dr. Killyon, and Nurse White). Kelly seeks damages in her state and federal actions under Texas's wrongful-

---

[3] Kelly's amended complaint also asserts this against Galveston County Jail. Dkt. 48 at 23. Because Galveston County Jail is not a defendant in this action, however, the court disregards this allegation.

[4] Kelly's amended complaint does not clearly identify these liability theories as solely state-law claims. *See generally* Dkt. 6. The plaintiff's response clarifies, however, that these are "state[-]law claims" brought "in the alternative to the constitutional claims." Dkt. 48 at 31.

death and survivorship statutes. *Id.* ¶¶ 134–144.

Since filing, Kelly has requested dismissal of all claims against Drs. Becker and Barnhart, Dkts. 33, 34, and the court has granted those motions, Dkts. 35, 36. The remaining defendants moved for summary judgment on all claims. Dkts. 46 at 24; 45 at 22.

## II.   LEGAL STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). The movant bears the burden of presenting the basis for the motion and the elements of the causes of action for which a genuine dispute of material fact does not exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to offer specific facts showing a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted). The court "may not make credibility determinations or weigh the

evidence" in ruling on a summary-judgment motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## III. ANALYSIS

The defendants move for summary judgment on the following grounds: (1) Kelly cannot establish deliberate indifference or substantial harm to support her § 1983 claim, Dkts. 45 at 11–13; 46 ¶¶ 16–21, (2) she cannot establish that the defendants' acts or omissions caused Cotton's death, Dkts. 45 at 14–15; 46 ¶¶ 22–26, and (3) she lacks standing, Dkts. 45 at 15–17; 46 ¶¶ 27–37.[5] The Healthcare Defendants also argue that Kelly's allegations raise no issue of material fact to support her § 1985 claim. Dkt. 45 at 20–21.

### A. Section 1983 Claims

Though the amended complaint and response are not a model of clarity, the court construes Kelly's § 1983 allegations as raising both episodic-acts-or-omissions claims and conditions-of-confinement claims.

---

[5] The Healthcare Defendants raise other reasons for the court to grant summary judgment on the plaintiff's state-law claims. *See* Dkt. 45 at 5. Because the court declines to exercise supplemental jurisdiction over those claims, it does not reach these arguments.

### 1. Applicable Law

### a. Cotton's Constitutional Protections

Kelly alleges that the defendants' actions violated Cotton's Fourth, Eighth, and Fourteenth Amendment rights. Dkt. 6 ¶¶ 81–90, 134–142; *see also* Dkt. 48 at 26–31.

A pretrial detainee's right to medical care "sounds not in the Fourth Amendment but in the Fourteenth." *Hill v. Carroll Cnty.*, 587 F.3d 230, 237 (5th Cir. 2009) (citation omitted); *see also Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019). The Eighth Amendment ensures convicted prisoners the right to medical care. *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996).

Kelly's allegations under the Fourth and Eighth Amendments fail as a matter of law because Cotton was a pretrial detainee at the time of the events giving rise to this action. Accordingly, the court reviews Kelly's § 1983 claim as arising under the Fourteenth Amendment.[6]

---

[6] States "owe[] the same duty under the [Fourteenth Amendment] Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care." *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000) (citing *Hare*, 74 F.3d at 650). Therefore, the court considers Eighth Amendment law as relevant in determining whether the defendants violated Cotton's due-process rights.

### b. 42 U.S.C. § 1983

Section 1983 provides a private right of action for the deprivation of rights, privileges, and immunities secured by the constitution or laws of the United States. 42 U.S.C. § 1983. A complaint under § 1983 must allege that the acts complained of occurred under color of state law and that the complaining parties were deprived of rights guaranteed by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *Piotrowski v. City of Houston*, 51 F.3d 512, 515 (5th Cir. 1995).

A complaint under § 1983 must also allege that the constitutional or statutory deprivation was intentional or due to deliberate indifference and not the result of mere negligence. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Plaintiffs may bring a § 1983 suit against state actors in their individual or official capacities or against a governmental entity. *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997)). But "[u]nder § 1983, officials are not vicariously liable for the conduct of those under their supervision." *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 420 (5th Cir. 2017) (citing *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992)).

## 2. Application

The court reads Kelly's pleadings as asserting liability against Dr. Killyon for unconstitutional "episodic acts or omissions" and the other defendants for unconstitutional conditions of confinement. The court addresses each type in turn.

### a. Episodic-Acts-or-Omissions Claim

An episodic-acts-or-omissions claim "faults specific [government] officials for their acts or omissions." *Est. of Henson v. Wichita Cnty.*, 795 F.3d 456, 463 (5th Cir. 2015); *see also Est. of Bonilla v. Orange Cnty.*, 982 F.3d 298, 304 (5th Cir. 2020) ("An episodic acts or omissions claim arises where 'the complained-of harm is a particular act or omission of one or more officials.'") (quoting *Flores v. Cnty. of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997)). A privately employed medical professional who treats an inmate or detainee on behalf of a government entity "act[s] under color of state law for purposes of § 1983."[7] *Sanchez*, 995 F.3d at 466 (citing *West v. Atkins*, 487 U.S. 42, 54 (1988)).

---

[7] The court acknowledges that though Dr. Killyon and White are state actors, they are not necessarily entitled to qualified immunity. *Sanchez v. Oliver*, 995 F.3d 461, 466 (5th Cir. 2021) (citing *Perniciaro v. Lea*, 901 F.3d 241, 251 (5th Cir. 2018), and *Brewer v. Hayne*, 860 F.3d 819, 823 (5th Cir. 2017) ("A defendant may act under color of state law for the purposes of § 1983 without receiving the related protections of qualified immunity.")). The court will not reach qualified immunity, however, because no reasonable jury could find that the defendants deprived Cotton of his Fourteenth Amendment rights.

Dr. Killyon was the supervising physician for Boon-Chapman who diagnosed and treated Cotton multiple times during the days at issue. Dkts. 48-6 at 2; 48 at 10–12. No other defendant is alleged to have directly interacted with Cotton.

The defendants argue that, viewing the evidence in a light most favorable to Kelly, Dr. Killyon did not treat Cotton with deliberate indifference. Dkt 45 at 11–13. Without clearly styling her argument as one of deliberate indifference, the court infers the plaintiff to argue that Dr. Killyon was deliberately indifferent in at least one way:[8] Dr. Killyon treated Cotton for his perceived constipation issues with fiber, Colace, and fluid, and ordered an x-ray for the next day, instead of realizing that Cotton suffered from diabetes and ordering preventative measures like a blood-glucose test. Dkt. 48 at 22, 27.

### i. Deliberate Indifference

"A government official violates a Fourteenth Amendment right when the official acts with deliberate indifference to a detainee's serious medical

---

[8] Kelly also seeks to hold Dr. Killyon directly liable for "delegating his duty to LVNs" to diagnose and treat Cotton and for not transferring Cotton to UTMB emergently. *See* Dkt. 48 at 22. Because other portions of the complaint and response allege Dr. Killyon took these actions in accordance with the policies and procedures of his employer and the Galveston County Jail, the court considers them as a basis for deliberate indifference in the conditions-of-confinement discussion.

needs." *Est. of Bonilla*, 982 F.3d at 305 (citation omitted). "Deliberate indifference is an extremely high standard to meet." *Id.* (quoting *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001)); *Cadena v. El Paso Cnty.*, 946 F.3d 717, 728 (5th Cir. 2020) (citation omitted). "Supervisory officials are accountable for their own acts of deliberate indifference," but they "are not vicariously liable" for their subordinates' acts. *Alderson*, 848 F.3d at 420.

To prove deliberate indifference, Kelly must show that Dr. Killyon "knew of and disregarded a substantial risk of serious harm." *Id.* (citing *Domino*, 239 F.3d at 755). This might include citing evidence demonstrating that Dr. Killyon "refused to treat [Cotton], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Perniciaro*, 901 F.3d at 258 (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

Deliberate indifference does not arise from unsuccessful medical treatment, negligent treatment, medical malpractice, a prisoner's disagreement with is medical treatment, or a decision to not provide additional medical treatment. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). "[F]ailure to alleviate a significant risk that [a medical

professional] should have perceived[] but did not" does not show deliberate indifference. *Domino*, 239 F.3d at 756 (quoting *Farmer*, 511 U.S. at 838). Finally, "[d]eliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight." *Alvarez v. City of Brownsville*, 904 F.3d 382, 391 (5th Cir. 2018) (citation omitted).

### ii. Dr. Killyon's Treatment

Dr. Killyon did not treat Cotton with deliberate indifference. Arguing the contrary, Kelly cites *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006), to contend that treating Cotton with "water, fiber supplements, and Colace for constipation" constituted deliberate indifference. Dkt. 48 at 10, 26–28. *Easter* does not support Kelly's contention.

First, it is well-established that negligent treatment or even medical malpractice does not amount to deliberate indifference. *James v. Harris Cty.*, 577 F.3d 612, 617–18 (5th Cir. 2009); *Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006) ("[D]eliberate indifference exists wholly independent of an optimal standard of care."); *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001). Therefore, the sensibility of Dr. Killyon's treatment does not create a question of material fact to support Kelly's claim of deliberate indifference.

Second, *Easter* is distinguishable from this case. In *Easter*, the Fifth Circuit found deliberate indifference where a nurse refused to assist a patient when she "knew that [the inmate] (1) had a heart condition, (2) was experiencing severe chest pain, and (3) did not have his prescribed heart medication." *Easter*, 467 F.3d at 463–65. There, the inmate's prior heart problems were "well-documented in his medical chart," indicating that the nurse was aware that the inmate had heart disease and had suffered a heart attack. *Id*. at 463. Here, the evidence shows that neither Dr. Killyon nor any other defendant knew Cotton had a history of diabetes.

The plaintiff claims that the defendants knew of Cotton's history of diabetes because his UTMB medical record shows that a UTMB doctor had diagnosed Cotton with diabetes and hypertension in December 2013. Dkt. 48-2 at 2. Still, the plaintiff concedes that "[p]er available records, Mr. Cotton did not have any ***active*** history of diabetes and was not on any diabetic medications or insulin at the time of his incarceration." Dkt. 48 at 7–8. Additionally, Cotton denied his history of diabetes upon intake at Galveston County Jail in January 2019 and admission to UTMB on March 13, 2019. Dkt. 45 at 9 (citing Dkt. 45-2 at 5–6); *id*. at 13 (citing Dkt. 45-1 at 23–26). Cotton also did not report his history of diabetes when he was admitted to Galveston County Jail in August 2016. Dkt. 46-10 at 2. Finally,

Kelly testified at her deposition that Cotton never told her he had diabetes and that Cotton's "main healthcare provider," Dr. Soleja, had tested Cotton for diabetes and found him negative. Dkt. 45 at 13 (citing Dkt. 45-8, 63:14–64:25).

In sum, a reasonable jury could not find that Dr. Killyon was deliberately indifferent to Cotton's medical needs. Accordingly, Dr. Killyon is entitled to summary judgment on Kelly's episodic-act-or-omission claim against him.

### b. Unconstitutional Conditions-of-Confinement Claim

Kelly expressly alleges that Galveston County,[9] Sheriff Trochesset, and Dr. Killyon are liable under a § 1983 conditions-of-confinement theory. Dkt. 6 ¶¶ 134–137. Kelly also asserts that all defendants set, sanctioned, approved of, implemented, or knowingly consented to unconstitutional policies and procedures. Dkts. 6 ¶¶ 63–64, 89 (Sheriff Trochesset); *id.* ¶¶ 65–70 (White);

---

[9] The plaintiff did not attempt to allege a *Monell* claim. *See generally* Dkt. 6. *Monell* provides an avenue for plaintiffs to hold municipalities liable under § 1983 for violating a plaintiff's constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The claims are also available against counties. *See, e.g.*, *Hill*, 587 F.3d 230. Even if the court read the complaint to seek *Monell* liability, the failed condition-of-confinement claim would be fatal to the plaintiff's *Monell* claim. *See Est. of Bonilla*, 982 F.3d at 308 (citations omitted) (recognizing "no meaningful difference" between the two types of claims that both hinge on whether a municipalities' policies or customs were "the moving force behind the [constitutional] violation").

*id.* ¶¶ 71–75 (Dr. Killyon); *id.* ¶¶ 76–77 (Boon-Chapman); *id.* ¶¶ 78–79 (Soluta); *id.* ¶ 80 (Galveston County). Though not clearly distinguishable from a general § 1983 claim in Kelly's response, the court reads the evidence and arguments in her response as extending the conditions-of-confinement claim to all defendants.

Plaintiffs alleging unconstitutional conditions of confinement must show:

> (1) a rule or restriction or the existence of an identifiable intended condition or practice or that the jail official's acts or omissions were sufficiently extended or pervasive;
> (2) which was not reasonably related to a legitimate governmental objective; and
> (3) which caused the violation of the inmate's constitutional rights.

*Cadena*, 946 F.3d at 727 (internal quotations omitted). "In some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by jail officials, to prove an intended condition or practice.'" *Id.* at 727 (citation omitted). "[A] detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs" and "a pattern is a heavy burden, one that has rarely been met in our caselaw." *Est. of Bonilla*, 982 F.3d at 452 (citation omitted). In contrast, "isolated examples of illness,

injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate." *Id.* at 309 (quotation omitted)

### i. LVNs Policy

According to Kelly, "[t]here is no way to describe the defendants' conduct in this case as anything other than deliberate indifference based on their policy to allow LVNs to diagnose and treat patients." Dkt. 48 at 28; *see also* Dkt. 48 at 22 (linking Dr. Killyon's alleged deliberate indifference to him "delegat[ing] his duty to LVN nurses to diagnose and treat Mr. Cotton.").[10] Kelly describes LVNs as "gatekeepers" and "barrier[s]" to "qualified medical personnel," which the Fifth Circuit has "rebuked as deliberately indifferent conduct." Dkt. 48 at 28.

Tellingly, Kelly cites no Fifth Circuit cases to support her assertion that a prison's use of LVNs to triage medical care equates to deliberate indifference. Dkt. 48 at 28–31. Instead, Kelly relies on unpublished cases from the Eastern District of Texas. Dkt. 48 at 29–30 (discussing *Mathis v.*

---

[10] This conclusory allegation, like most in the plaintiff's response, is supported by a string of citations to extensive exhibits without page numbers. The court admonishes plaintiffs' counsel to do better. *de la O v. Hous. Auth. of City of El Paso, Tex.*, 417 F.3d 495, 501 (5th Cir. 2005) (noting that perfunctory and conclusory assertions will not suffice because "judges are not like pigs, hunting for truffles buried in briefs"); *see also Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.") (quotation omitted) (collecting cases).

*Sw. Corr., LLC*, No. 5:20-cv-146-RWS-CMC, 2021 WL 5088276, at *28 (E.D. Tex. June 15, 2021), and *Sabbie v. Sw. Corr., LLC*, No. 5:17-cv-113-RWS-CMC, 2019 U.S. Dist. LEXIS 214463, at *124 (E.D. Tex. Mar. 6, 2019)).

Setting aside that these cases do not bind this court, they are readily distinguishable. For instance, Kelly relies on *Mathis* for the proposition that a failure by a licensed practical nurse to refer an inmate to the prison's medical doctor despite persistent complaints of extreme pain and symptoms *for over a week* constituted deliberate indifference. Dkt. 48 at 29. That case involved nurses' treatment of an inmate who was visibly disabled, malnourished, soiled, and dehydrated. *Mathis*, 2021 WL 5088276, at *22. The complaint in that case described an abhorrent scene of an inmate sitting alone in soiled clothing for over three days, receiving no food, begging for water, and waiting alone in her cell for almost ten hours after a nurse tested her vitals and found blood-pressure levels high enough to "indicate[] a hypertensive crisis." *Id.* *22–23 & n.20.

*Sabbie* is similarly distinguishable. Unlike Cotton, who denied a history of diabetes when he was processed at Galveston County Jail, the decedent–inmate in *Sabbie* informed jail intake staff that he suffered from heart disease, asthma, hypertension, and diabetes, and that he used medication to treat these ailments. *Sabbie*, LLC, 2019 U.S. Dist. LEXIS

214463, at *13. Despite that, the *Sabbie* inmate was not given his medication during confinement. *Id.* at * 14. Moreover, although the inmate exhibited "classic sign[s] of congestive heart failure," and the nurse–defendants observed "alarming abnormalities," they failed to take the inmate's vitals, check his blood sugar, follow protocols, contact the supervising physician, document his visits, or even look at his chart when he repeatedly complained of shortness of breath and exhibited a dangerously high heart rate. *Id.* At * 17–25, 123–24. Accordingly, the court there found that a reasonable jury could find the nurses deliberately indifferent. *Id.* at * 124.

The Fifth Circuit has examined staffing policies like those in this case and found them constitutional. *See, e.g.*, *Est. of Henson v. Wichita Cnty.*, 795 F.3d 456, 469 (5th Cir. 2015) ("[T]he policy of hiring LVNs instead of registered nurses and requiring LVNs to call the on-call doctor . . . does not make the medical system unconstitutional."); *see also Cadena*, 946 F.3d at 728 (finding that "the use of LVNs to perform medical intake procedures," among other policies, did not "amount[] to an unconstitutional condition of confinement").

Moreover, the LVNs who saw Cotton were not a "barrier" to Dr. Killyon. After Cotton's initial visit on March 12th, each LVN who interacted with Cotton during the events leading to his death either called to consult

with or directly led Cotton to Dr. Killyon. Dkt 48 at 10–11; *see also* Dkt. 48-1 at 41–42. Finally, Kelly has not alleged any other constitutional violations at Galveston County Jail stemming from the use of LVNs. *See* Dkt. 6 ¶¶ 57–62.

In summary, there is no evidence that could lead a reasonable jury to conclude that the LVNs' interaction with Cotton amounted to deliberate indifference.

### ii. Non-Emergent-Transfer Policy

Kelly also alleges that the defendants have a policy of "not allowing inmates who are in need of emergency care to [be] transported to the hospital by ambulance while in the custody of the Galveston County jail" and instead requiring them to "wait[] for a jail[-]transportation vehicle." Dkt. 48 at 15; *see also id.* at 22 (pointing out that Dr. Killyon "did not transfer Mr. Cotton to UTMB emergently"). Kelly argues that the defendants were deliberately indifferent because "delays in necessary medical care that include cursory or grossly inadequate treatments constitute deliberate indifference." Dkt. 48 at 27. These allegations fail for at least two reasons.

First, a reasonable jury could not find that Dr. Killyon's decision flowed from an official "policy" or *de facto* policy flowing from a pattern of acts or omissions "sufficiently extended or pervasive." Though Kelly identifies a number of other inmates who allegedly experienced deliberate indifference

during their time at Galveston County Jail, she offers no evidence to support those instances and does not allege that those inmates' alleged constitutional injuries flowed from a policy of not transferring inmates emergently. Dkt. 6 ¶¶ 57–62. Therefore, no reasonable jury could find that Dr. Killyon's decision to transfer Cotton to UTMB non-emergently flowed from an official or *de facto* policy.

Even if such a policy existed, no reasonable jury could find that it caused Cotton to suffer deliberate indifference. Taking into consideration what the defendants knew at the time, the fifty-three-minute "delay" between when Dr. Killyon ordered Cotton's non-emergent transfer to UTMB and when Cotton arrived at UTMB does not constitute deliberate indifference. *See Spikes v. McVea*, 8 F.4th 428, 430–32 (5th Cir. 2021), *on reh'g*, 12 F.4th 833 (5th Cir. 2021), *reh'g denied*, No. 19-30019, 2021 WL 4978586 (5th Cir. Oct. 13, 2021) (finding deliberate indifference where medical personnel treating inmate complaining of intense pain and inability to walk prescribed ibuprofen and muscle rub, neglected to order an x-ray, and punished the inmate for seeking treatment multiple times over *six weeks*).[11]

---

[11] *See also Easter*, 467 F.3d at 463–65 (holding that a four-hour delay in administering medication was enough for deliberate indifference when medical personnel *knew* of the inmate's "well-documented" history of poor heart health, severe chest pain, and lack of access to prescribed heart medication).

In summary, Kelly has not met her burden to raise a genuine issue of material fact as to whether a policy regarding non-emergent transfer even existed, much less that such a policy violated Cotton's Fourteenth Amendment rights.

### c. Doe Defendants

Kelly also asserts § 1983 liability against "Doe Nurses" and "Doe Jailers." Dkt. 6 ¶¶ 25, 131. No reasonable jury could find this group of defendants liable under the federal civil-rights claims because "[p]ersonal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) (citing *Rizzo v. Goode*, 423 U.S. 362, 371–72, 377 (1976)). Accordingly, the court grants summary judgment as to all federal claims asserted against these defendants.

*   *   *

There is no question of material fact to support Kelly's § 1983 episodic-acts-or-omissions or unconstitutional-confinement claims against any of the defendants. Accordingly, the court grants the defendants' motions for summary judgment on the § 1983 claims.

## B. Section 1985 Claim

Kelly mentions 42 U.S.C. § 1985 twice in her complaint. Dkt. 6 at 1, 18. But she does not offer facts or law to support her claim and does not tell the

24/26

court which part of § 1985 the defendants violated. *See* 42 U.S.C. § 1985 (prohibiting three types of acts: "(1) Preventing officer[s] from performing duties"; (2) "Obstructing justice; intimidating party, witness or juror"; or (3) "Depriving persons of rights or privileges"). Reading the complaint generously, the court could infer that the allegations of a "conspiracy of silence" against Dr. Barnhart flow from 42 U.S.C. § 1985(3). But Dr. Barnhart is no longer a defendant in this suit. Dkt. 36. Accordingly, the court finds Kelly has abandoned her § 1985 claim. *See Black v. N. Panola School Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006). Therefore, the defendants are entitled to summary judgment on that claim.

*   *   *

For the above reasons, the court grants the defendants' motions for summary judgment as to all federal claims and dismisses those claims with prejudice. Dkts. 45, 46. Because the court lacks original jurisdiction over the plaintiff's state-law claims, the court declines to exercise supplemental jurisdiction over these remaining claims. 28 U.S.C. § 1367(c)(3). The court therefore remands this action to the 10th Judicial District Court of Galveston County. All other pending motions are denied as moot. Dkts. 38, 39.

Signed on Galveston Island this 29th day of November, 2022.

JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE